## UNITED LINES TELEGRAPH COMPANY *v.* BOSTON SAFE DEPOSIT AND TRUST COMPANY.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK.

No. 106.   Argued January 5, 6, 1893. — Decided January 30, 1893.

The question of priority between two mortgages on lines of telegraph, considered.

A sale of real estate under judicial proceedings concludes no one who is not a party to those proceedings.

THE case is stated in the opinion.

*Mr. Robert G. Ingersoll* for appellants.

*Mr. William G. Wilson,* (with whom was *Mr. Hamilton Wallis* on the brief,) for appellee.

MR. JUSTICE BLATCHFORD delivered the opinion of the court.

On the 28th of August, 1883, a written agreement was made between the American Rapid Telegraph Company, (hereinafter called the Rapid Company,) a Connecticut corporation, and the Bankers' and Merchants' Telegraph Company, (hereinafter called the Bankers' Company,) a New York corporation. It recited that the Rapid Company was desirous of extending its telegraph system so as to connect Buffalo, New York, by a northerly route, with Chicago, Illinois; Pittsburg,

Pennsylvania, via Columbus, Ohio, Indianapolis and Terre Haute, Indiana, with St. Louis, Missouri; Columbus, Ohio, with Cincinnati, Ohio, and Louisville, Kentucky; and Terre Haute, Indiana, with Chicago, Illinois; and that the Bankers' Company was in a position to contract for and cause the construction or procurement, by purchase or otherwise, of portions or all of said lines. The agreement then provided as follows:

(1) The Bankers' Company agreed to construct or acquire, and to deliver to the Rapid Company, a four-wire telegraph line connecting the before-mentioned points, and to average not less than 35 poles, 30 feet long, to the mile, with two No. 6 and two No. 8 gauge galvanized extra B B wires thereon; to procure all rights of way; to fit up and furnish all offices; and to complete the whole within one year from the above date.

(2) The Rapid Company agreed to issue and deliver to the Bankers' Company, as soon as might be, $3,000,000 par value of first mortgage gold bonds, with coupons attached for 6 per cent interest from March 1, 1884, to September 1, 1893, payable semi-annually, the bonds to be secured by a mortgage dated September 1, 1883, covering all the franchises and property, including patents, of the Rapid Company, "as now owned by it, or hereafter to be acquired by it, including the lines and property to be constructed or acquired under the provisions of this contract."

(3) The floating debt of the Rapid Company, as a confidential obligation, having preference as to lien and payment before the said $3,000,000 of bonds, was to be reduced by the appropriation of the assets of the Rapid Company thereto, and the balance then remaining unpaid, not exceeding $100,-000, was assumed by the Bankers' Company.

(4) Any difference regarding the interpretation or fulfilment of the agreement should be submitted to the decision and determination of Frederic H. May, whose decision should be final and binding on both companies.

On the 29th of August, 1883, a written agreement was made between the Bankers' Company and George S. Bullens, of

Boston, Massachusetts, holding for himself and others a majority in amount of the capital stock of the Rapid Company. That agreement referred to and recited the terms of the agreement of August 28, 1883, before mentioned; that the Bankers' Company was desirous of exchanging the whole or a large portion of the $3,000,000 of bonds for the capital stock of the Rapid Company; and that Bullens, acting for himself and associates, was willing to make such exchange. It then provided as follows: (1) The Bankers' Company obligated itself, as soon as it received the $3,000,000 of bonds of the Rapid Company, under the agreement of August 28, 1883, to deposit the same forthwith in the hands of Bullens, as trustee, and under a letter of instructions to him to hold them for exchange, dollar for dollar, with himself or others, for the stock of the Rapid Company, said stock, as soon as received by the trustee, to the extent of 51 per cent, to be handed over at once to the Bankers' Company; the balance of such stock, so received in exchange for bonds, or the balance of the bonds, if any, not exchanged, was to be held by Bullens, as trustee, until the completion of the lines of telegraph agreed to be built by the Bankers' Company under the agreement of August 28, 1883, and until the payment of the floating debt of the Rapid Company, and then handed over to the Bankers' Company; and the latter was to authorize Bullens to continue the exchange of bonds for stock up to, but not beyond, sixty days from August 29, 1883; (2) Bullens agreed to deliver to himself as trustee, for the purpose of exchanging for the bonds, not later than ten days from August 29, 1883, at least 51 per cent of the total stock of the Rapid Company, then outstanding.

The Rapid Company had been formed for the construction and operation of a system of telegraph lines. By the summer of 1883, it had constructed and equipped lines from Boston, Massachusetts, to Cleveland, Ohio, and Washington City; but, although its receipts from business then exceeded its outlay for operating expenses, it found that it needed extensions to Chicago, Cincinnati, St. Louis and Louisville, and the intermediate points. It turned its attention to the Bankers' Com-

pany, which, though having only a line from New York to
Washington City, was doing a good business, and had in it
men of means.  It was supposed by both companies that each
had something of advantage to offer to the other.  Accord-
ingly, the agreement of August 28, 1883, was made, to connect
Buffalo with Chicago, Pittsburg with St. Louis, Terre Haute
with Chicago, and Cincinnati with Louisville.

The agreements of August 28 and 29, 1883, were forthwith
acted upon.  The mortgage of the Rapid Company to secure
the $3,000,000 of bonds was made September 15, 1883, to the
Boston Safe Deposit and Trust Company, a Massachusetts cor-
poration, (hereinafter called the Boston Company,) as trustee,
and by its terms covered all the property of the Rapid Com-
pany, as incorporated by Massachusetts, Connecticut, New
York, New Jersey, Pennsylvania, Maryland and Ohio, or
which might thereafter be acquired by those corporations, to-
gether with the lines of telegraph intended to be constructed
or acquired for the Rapid Company, so as to connect Buffalo
with Chicago, Pittsburg with St. Louis, Columbus with Cin-
cinnati, and Louisville and Terre Haute with Chicago, and all
property then owned or thereafter acquired for use in connec-
tion with said lines or property, or any of them.  The $3,000,000
of bonds were issued to the Bankers' Company, and it trans-
ferred them at once to Bullens.  Bullens exchanged them for
the stock of the Rapid Company, so far as the holders of such
stock elected to make the exchange, and transferred the 51
per cent of the stock to the Bankers' Company, retaining the
remainder of the exchanged stock and all the unexchanged
bonds.  The Bankers' Company entered at once upon the per-
formance of its part of the agreement of August 28, 1883,
made a contract with telegraph constructors to build the new
lines, and sent out men to locate those lines, under the super-
vision of Frederic H. May, who was the general manager of
the Rapid Company.

All went on smoothly until May, 1884, when the Bankers'
Company became financially embarrassed.  At that date the
line from Cleveland to Chicago had been substantially com-
pleted.  The line between Freeport, Ohio, and Hammond, on

the State line between Indiana and Illinois, had been built by contract with Baldwin & Miller. The line between Cleveland and Freeport, Ohio, was built by a contractor named Farnsworth; and the line between Hammond and Chicago was built by employés of the Bankers' Company, without the intervention of any contractor. The four wires called for by the agreement of August 28, 1883, were connected through the different parts above mentioned, and the line was inspected and found to be complete. The line ran into the city of Cleveland over the poles which carried out of that city the line of the Rapid Company to Pittsburg and the East, and the two lines met and were connected by the same switch-board in the Cleveland office. In June, 1884, returns were made to New York of the business done by the offices between Cleveland and Chicago. The four wires above mentioned were working through to New York, and so continued to do, with the exception of a brief interval in August, 1884, down to December 30, 1887, when the suit now before us was commenced.

In July, 1884, the line between Pittsburg and Terre Haute was nearly completed, but there were gaps in it in various places, and it had not been connected with the Rapid Company's system at Pittsburg. The work upon it, so far as it had progressed, had been done by Baldwin & Miller, before mentioned, who stopped work in July or August, 1884.

Between the date of the agreement of August 28, 1883, and the month of July, 1884, the Bankers' Company or its stockholders acquired a majority in the board of directors of the Rapid Company, and elected or appointed the officers and managers of the Bankers' Company to the corresponding positions in the Rapid Company. Thus, the same men controlled the corporate machinery and property of both companies. A practical union of the two properties was expected to result from the complete performance of the agreement of August 28, 1883, and hence the Bankers' Company proceeded to string additional wires over a large part of the original lines of the Rapid Company, the receipts of the business of both companies went into a common treasury, and their operating ex-

penses were paid from the same source. A considerable sum, also, was spent in the repair and improvement of the original lines of the Rapid Company. The mortgage by the Rapid Company for $3,000,000 was recorded in Ohio between October 12 and December 22, 1883.

On November 24, 1883, the Bankers' Company, as a New York corporation, and as a New Jersey corporation, and as a Pennsylvania corporation, and as a Maryland corporation, executed a mortgage to the Farmers' Loan and Trust Company, a New York corporation, as trustee, to secure $10,000,000 of bonds of the Bankers' Company, and conveying all its property, including its "stocks of other companies" and "situate within the States of New York, New Jersey, Pennsylvania and Maryland, the District of Columbia, and within any other State or Territory of the United States," then owned or which might be thereafter acquired.

Default was made in the payment of the interest coupons which became due September 15, 1884, on the $3,000,000 of bonds of the Rapid Company. By the terms of the Rapid Company's mortgage, however, no proceedings for foreclosure could be begun until the default had continued for six months. On March 23, 1885, the Boston Company, trustee under the $3,000,000 mortgage, filed a bill in the Circuit Court of the United States for the District of Connecticut, for the foreclosure of that mortgage.

One Austin G. Day having recovered a judgment in the Supreme Court of New York against the Bankers' Company, sequestration proceedings followed, and on September 23, 1884, Richard S. Newcombe and James G. Smith were appointed by that court receivers of the Bankers' Company in New York. Those receivers were permitted to assume possession and control of the entire property of the Rapid Company, including the new line between Cleveland and Chicago, which was then in full operation as a part of the Rapid Company's system; and they were permitted to do so without any remonstrance from the officers of the Rapid Company, those officers being in fact the officers of the Bankers' Company and wholly in its interest. Smith, one of the receivers, was assistant general

manager of the Bankers' Company and also assistant general manager of the Rapid Company.

In the foreclosure suit in Connecticut, the Boston Company applied for the appointment of a receiver of the Rapid Company's property. That application was opposed by the receivers of the Bankers' Company, and by Edward S. Stokes, as the holder of receivers' certificates issued by them, and also by the Rapid Company, represented by the same officers who had suffered those receivers to take possession and control of the property of the Rapid Company. In spite of this opposition, the Connecticut court appointed Edward Harlan receiver of the property of the Rapid Company, and his receivership was extended over the whole property of that company by the courts of the other jurisdictions through which that property ran. Newcombe and Smith were succeeded as receivers by one James B. Butler, and he by John G. Farnsworth, who was appointed May 1, 1885, in an action brought by the Farmers' Loan and Trust Company to foreclose the $10,000,000 mortgage made by the Bankers' Company. In the latter suit, a foreclosure sale was had July 31, 1885, and Stokes bid the sum of $500,000 for the property of the Bankers' Company. By his direction, that sale was completed by a conveyance of the property to the United Lines Telegraph Company, a New York corporation, the deed of the referee being dated August 10, 1885, and acknowledged and recorded November 14–16, 1885.

The suit now before us was brought in the Circuit Court of the United States for the Southern District of New York, December 30, 1887, by the Boston Company against the Bankers' Company, the United Lines Company, Newcombe, Smith, Butler, Farnsworth, Stokes and the Rapid Company, as a Connecticut corporation. It is founded on the fact that there were conflicting claims to the title to the property covered by the terms of the $3,000,000 mortgage, and is brought in aid of the original suit in Connecticut, to determine those claims and ascertain what property was included in the mortgage. It embraces issues as to the right and title of the Rapid Company, and of the plaintiff, as trustee under

the $3,000,000 mortgage, to (1) those of the original lines of the Rapid Company called "reconstructed lines," which were in some measure repaired and rebuilt after the agreement of August 28, 1883; (2) the "strung wires," being wires strung upon the lines of the Rapid Company after the date of that agreement; and (3) the "Western lines," or lines described in that agreement and built thereafter, so far as they were built.

After issue was joined in the present suit, proofs were taken, and the case was heard before Judge Wallace. His opinion was delivered September 19, 1888, (36 Fed. Rep. 288,) and a final decree was entered April 4, 1889, adjudging that (1) as to the reconstructed lines, they remained the property of the Rapid Company; (2) as to the strung wires, they belonged to the Bankers' Company; and (3) as to the Western lines, the plaintiff having abandoned its claim to the unfinished southerly line between Pittsburg and Indianapolis, and insisted only that it was entitled to the northerly line between Cleveland and Chicago, (because that line was built and completed for the Rapid Company under the agreement of August 28, 1883, and was subject to the Rapid Company's mortgage,) the court so held. It is only this last point of the decision, affecting the line between Cleveland and Chicago, that is now under review, and the only appellants are the United Lines Company and Stokes.

The United Lines Company claims the property in question under its purchase on the decree of foreclosure of the $10,000,-000 mortgage of the Bankers' Company, and asserts that its title is paramount to that of the plaintiff.

The answer of Stokes in the suit is a joint answer with the United Lines Company, and alleges that part of the property in controversy was sold on a judgment of the Court of Common Pleas of Cuyahoga County, Ohio, and that Stokes became the purchaser of it at that sale. The opinion of Judge Wallace says that as it appears that that sale was set aside and vacated as void, by an appellate court having jurisdiction, and as Stokes sets up in his answer no other right or claim, the controversy is reduced to the single question of title to the prop-

erty in dispute as between the plaintiff and the United Lines Company.

The Circuit Court said, in view of the two agreements of August, 1883, and of the testimony, that it was the understanding on the part of all concerned that the Bankers' Company was to acquire the property and control of the Rapid Company by acquiring all or a majority of the stock of the latter; that the stockholders of the Rapid Company, as an inducement to their consent, were to receive for their stock, dollar for dollar, the bonds of the Rapid Company secured by a mortgage which was to cover, not only all the property then owned by the company, but also the new lines which the Bankers' Company was to construct and deliver under the agreement; that the new line of telegraph which was built by the Bankers' Company, connecting the system of the Rapid Company at Cleveland with Chicago, was built upon rights of way secured in the name of the Bankers' Company, or of subordinate corporations of which that company was the owner, and through which it acted; that Mr. May, who represented the Rapid Company, was requested by the officers of the Bankers' Company to supervise the selection of the route, and did so; that, while the line was in process of construction, it was understood by those who represented the two companies that it was being built to form a part of the line which was to be a connected system between the Rapid Company at Buffalo, by a northerly route, and Chicago; that the portion of the new line which was to extend from Cleveland to Buffalo by a northerly route was not commenced; that the new line from Chicago to Cleveland was inspected and accepted by the Bankers' Company and was connected with the Rapid Company's system at Cleveland, the wires running into the office of the Rapid Company there; that, as early as July, 1884, the line was used as an adjunct of the Rapid Company's system; that there was no formal transfer or delivery of that line by the Bankers' Company to the Rapid Company; that detached portions of the lines from Pittsburg to St. Louis, by way of Indianapolis and Terre Haute, and from Cleveland to Chicago, by way of Cincinnati, Indianapolis and Terre Haute,

were built, but they were not completed prior to the appointment of a receiver of the Bankers' Company; and that the question of the lien of the $3,000,000 mortgage on those uncompleted lines was not involved.

As to the question of the validity of the $3,000,000 mortgage of the Rapid Company, the Circuit Court held that there was nothing immoral or dishonest in the transaction, on the part of that company or its stockholders; that there was nothing in the proof to show that those in control of the Bankers' Company were not acting in good faith towards the stockholders of the Rapid Company, their own company, or the public, or that there was any plan or purpose on their part, except to promote and consummate the legitimate business scheme of merging the two companies, and building up an extensive telegraph business, by extending and consolidating the existing systems; that there was no reason to doubt that the promoters would have carried out their enterprise honestly, and that their expectations would have been measurably realized, if the Bankers' Company had not become financially crippled at an early stage; that the proofs do not show that the parties to the August agreements, either those who represented the one company or the other, had any fraudulent design upon the public to be carried out by means of the mortgage; that, when the August agreements were made, the Bankers' Company had in its treasury, or available, about $1,000,000, and was supposed by those who represented the Rapid Company to be financially able to carry out its undertaking; that the case is destitute of evidence to justify the assumption that those who represented the Rapid Company supposed that the agreement of the Bankers' Company was to be carried out at the expense of third persons, much less by defrauding third persons; that the fact that the Bankers' Company used the bonds secured by its $10,000,000 mortgage to obtain the means for building the new line, was not inconsistent with the good faith of the officers of that company; that, at all events, the bondholders represented by the plaintiff were not shown to have been implicated in any fraudulent scheme; that the organic law of the corporations permitted them to do what

was provided for by the August agreements, and there was no ground upon which to assail the $3,000,000 mortgage as *ultra vires;* that the Rapid Company did not assert any objection to that mortgage; that those who were stockholders of the Rapid Company and became its bondholders, did not allege, and the Bankers' Company, after receiving the bonds and exchanging them for stock, could not be heard to allege, want of consideration, or a fraudulent consideration, or that the acts of the Bankers' Company, in acquiring and transferring the bonds, were without legal validity, while it retained the stock which it received as the fruits of the transaction, nor could it be permitted to assert that the August agreements were *ultra vires,* while retaining the fruits thereof; that it was equally clear that the bondholders of the $10,000,000 mortgage, who became creditors of the Bankers' Company after all those transactions took place, could not be heard to impeach the consideration of the plaintiff's mortgage; and that the question as to the rights of the parties to the property in controversy was merely whether it was covered by the lien of the mortgage, or equitably belonged to the plaintiff, and whether the rights of the plaintiff therein were paramount to those acquired under the $10,000,000 mortgage.

The Circuit Court further held that there was no satisfactory reason why the lien of the $3,000,000 mortgage should not include the "reconstructed lines;" that that mortgage was duly recorded before the $10,000,000 mortgage of the Bankers' Company was recorded, and no question arose under the registry act as to the priority of lien of the respective mortgages; that if it should be conceded that the money of the Bankers' Company exclusively was used in the improvements and reconstruction of those lines, and the improved value of the property represented nothing except what was put into it by the Bankers' Company, there was nothing to distinguish the case from the ordinary one where a mortgagor or his vendee of the mortgaged property makes repairs and improvements of a permanent character; that such improvements as become a part of the realty always enure to the security of the mortgage; but that the "strung wires" did not come

under the operation of that rule, as they did not lose their character as personalty.

The Circuit Court further held that the line from Cleveland to Chicago was constructed to connect Buffalo by a northerly route with Chicago, pursuant to the agreement of August 28, 1883, and was the same property described in and conveyed by the $3,000,000 mortgage, as "intended to be shortly constructed or required" for the Rapid Company; that the circumstance that there was no formal delivery or transfer of that property to the Rapid Company by the Bankers' Company was not material; that as soon as it was acquired by the Bankers' Company it became in equity the property of the Rapid Company; that it was competent for the latter to mortgage the lines which were not in existence at the date of the mortgage, but which, by the agreement of the Bankers' Company, were to be built or acquired thereafter, and were, by the terms of the mortgage, to enure to the security of the bondholders; that such a mortgage, although ineffectual as a conveyance *in præsenti*, took effect as an equitable transfer, and attached to the after-acquired property, as soon as the title of the mortgagor accrued; that this case was exceptional only because it presented a question of priority between two mortgages of after-acquired property; that upon the principle that, as between equal equities, priority of time will prevail, the lien of the $3,000,000 mortgage was paramount to that of the $10,000,000 mortgage subsequently created; that much stress had been laid upon the circumstance that the line in question was paid for in bonds of the $10,000,000 mortgage, or with the proceeds of such bonds, but that such fact was of no legal significance; and that those who bought the bonds of the $10,000,000 mortgage had no higher claim for consideration than the bondholders under the $3,000,000 mortgage, who parted with their property upon the promise that this line should stand as security for the payment of their bonds.

The Circuit Court further held, that the United Lines Company did not occupy the position of a *bona fide* purchaser of the property; that full notice of the equities and claims of the plaintiff was given to it before it purchased the property at

the foreclosure sale; that it acquired the rights of the bond-holders under the $10,000,000 mortgage, and nothing more; that as to the suggestion that receivers' certificates were created pursuant to orders of the courts, in suits brought in state courts in New York and Ohio, in which receivers of the property of the Bankers' Company were appointed, which certificates were declared by the orders to be first liens on all the property of that company, and as to the contention that the lien of the $3,000,000 mortgage could not have precedence of those certificates, it was to be said that, as the plaintiff was not a party to those suits, the orders by which the certificates were created were nugatory as an adjudication upon the equities of the plaintiff; that no judgment in those suits could bind the plaintiff by a declaration that the certificates should outrank its equitable lien; that a purchaser of such certificates would not acquire a lien prior to the $3,000,000 mortgage upon the property included in it when it was recorded, or upon the accessorial improvements and additions; that it was not clear that a purchaser without notice and for value would not obtain a paramount lien upon the western lines, assuming that the certificates were authorized by a competent court having possession of the property by its receivers at the time; that those questions were not properly before the court, and could not be considered under the issues made by the pleadings; that the defendants did not assert in their answer that they were *bona fide* purchasers of such certificates, but the United Lines Company set up title under the foreclosure of the $10,000,000 mortgage, and Stokes founded his claim upon the sale by the Ohio court, which sale had been set aside; that it was no obstacle to the relief prayed by the bill that the real estate sought to be subjected to the decree was in another State; that it sufficed that the court had jurisdiction of the persons of the defendants and could compel them to observe its decree; and that there ought to be a decree for the plaintiff, conformable to the foregoing conclusions, with a reference to a master, if necessary, to ascertain what property was to be included in the description of the "reconstructed lines" in the decree.

After the delivery of the opinion, the United Lines Company and Stokes moved for a reargument on certain questions; but the motion was denied, and an order was made October 26, 1888, referring it to a special master to ascertain what property was to be included in the description of the property to be awarded to the plaintiff by the decree, and also to settle the decree. The special master, after hearing the parties, made a report, on January 18, 1889, determining the property to be so included and settling thé form of the decree, and reporting to the court the evidence taken before him. The plaintiff excepted to the report, as also did the defendants the United Lines Company and Stokes, and Farnsworth, receiver. On a hearing of the exceptions, the court modified the description reported by the special master and the form of decree settled by him, confirmed his report subject to certain specified amendments, and on April 4, 1889, entered the final decree, before mentioned, in favor of the plaintiff, from which the United Lines Company and Stokes have appealed.

It is contended for the appellants that —

(1) Under the agreements of August, 1883, no bonds of the Rapid Company were to be delivered to the Bankers' Company; the bonds were intended for the stockholders of the Rapid Company and for no one else; the delivery made was simply colorable; the persons receiving them, apparently for the Bankers' Company, really received them for the purpose of handing them over to Bullens, the trustee, that they might be exchanged for the stock of the Rapid Company; and the Bankers' Company never received one of those bonds.

(2) The Bankers' Company, as a matter of law, had no right to build the Western lines for the Rapid Company, or any lines except for itself, and no right, in àny event, to build lines for another company by using the proceeds of its own bonds in constructing such lines, leaving the holders of its bonds without any security.

(3) If the Bankers' Company in fact tried to build the Western lines for the Rapid Company, with money raised by the sale of the bonds of the Bankers' Company, and intended to turn such lines over to the Rapid Company, leaving its own

bondholders without any security, the transaction was fraudulent, and the Rapid Company was a party to the fraud.

(4) The evidence showed that the Rapid Company knew that the Bankers' Company had no money of its own with which to build the Western lines, and that the money for such construction was being raised by the sale of the Bankers' Company's bonds, and also knew that the purchasers of those bonds had been informed by the Bankers' Company that the bonds had been secured by a deed of trust to the Farmers' Loan and Trust Company on all the lines which the Bankers' Company then had, and on all which it might thereafter build; and the Rapid Company, so knowing, and having kept secret its agreements of August, 1883, was estopped from claiming any part of said lines as its property or as having been built for it.

(5) The Western lines, as a matter of fact, never were completed by the contractors for the Bankers' Company, and never were in fact delivered to that company before the appointment of the receivers in the foreclosure suit against it; so that it was never in a position to deliver the lines to any other company, even if the contract for such delivery had been honest and valid.

(6) The lines were never delivered by the Bankers' Company and were never received by the Rapid Company; no settlement was had between the companies; the Bankers' Company was never in a position to deliver the lines, never having had possession of them; the lines were put in possession of the receivers appointed in suits commenced by the contractors; afterwards they came into the possession of the receivers appointed in the foreclosure suit; and those receivers were authorized to issue $130,000 in certificates, and secure the same by a deed of trust to the Farmers' Loan and Trust Company.

(7) The Bankers' Company having failed to pay the amount due to contractors for construction and material, and receivers' certificates having been issued, the property came into the possession of the receivers of the Bankers' Company, and was never in the possession of the Rapid Company or of its receiver.

(8) Afterwards, it being impossible to finish the lines and

to keep them in repair from the earnings, the deed of trust made to secure the receivers' certificates was foreclosed; the receiver of the Rapid Company, duly appointed by the Circuit Courts of the United States in Connecticut, New York and Ohio, became a party to said action; and in that action a decree was entered that the property be sold for the payment of the receivers' certificates.

(9) The receiver of the Rapid Company, having been a party in the foreclosure suit in Ohio, was bound by the decision in that case; the ownership of the lines now in dispute, from Cleveland to Chicago, was settled in that suit by a court of competent jurisdiction, in a case where all the necessary parties were either plaintiffs or defendants, and such decision was final and binding upon all.

(10) The court below was misled, and supposed that the suit in Ohio had been decided upon the merits against the appellants in this case, or had been dismissed.

(11) The decree herein should be reversed and the property restored.

But we are of opinion that the line from Cleveland to Chicago became the property of the Rapid Company and was subject to the mortgage made by that company. That result was contemplated in the agreement of August 28, 1883, and in the mortgage of September 15, 1883. The $3,000,000 of bonds issued under that mortgage were delivered to the treasurer of the Bankers' Company on March 3, 1884. It was deliberately agreed between the two companies that the new lines in the West were to be built, were to belong to the Rapid Company, and were to be part of the security for the Rapid Company's bonds. The force of that agreement was not impaired by the fact that the Bankers' Company had made the further agreement of August 29, 1883, to exchange those bonds for stock, so far as the stockholders of the Rapid Company might elect to make such an exchange. Those who took the bonds from the Bankers' Company under the circumstances were authorized to expect that the company would perform its agreement, which was to give added security for the bonds, and they had a right to rely on such performance.

The line from Cleveland to Chicago was completed in compliance with the agreement, and was intended to be *pro tanto* a performance thereof. No further delivery of that line was practicable or requisite, than that which was made by connecting it with the system of the Rapid Company and using it as a part of that system. The same officers represented both companies, and both companies had the same general manager. His duty to his two principals, namely, the trust on the one side to deliver and on the other to receive the property, was sufficient to effectuate the necessary delivery from the Bankers' Company to the Rapid Company.

There is no ground for assailing the good faith of the agreement of August 28, 1883. It was entered into with perfect good faith on the part of the Rapid Company, and with every appearance of good faith on the part of the Bankers' Company; it violated no principle of law and no rule of good morals; and if it had been fully carried out, it is probable that both parties would have realized from it the benefits which they anticipated.

Nor is there any force in the objection that the agreement was *ultra vires*, on the part of the Bankers' Company. The statutes of New York authorized and justified it. The general power of a corporation to hold property in States other than the one which incorporated it, (in the absence of statutory prohibition in such States,) is firmly established. The Bankers' Company received the benefit of the August agreement, through which alone it acquired control of the Rapid Company, it enjoyed that control, took all the receipts of the Rapid Company's business, profited by the good will which that company had acquired, and thus obtained a benefit from the August agreement, which is beyond its power to restore; and the bondholders of the Bankers' Company, who are simply its creditors, and became such after the August agreement was made, are bound by the agreement made by it within the scope of its corporate powers.

It seems quite clear that the equities of the plaintiff and of the bondholders of the Rapid Company are superior to those of the bondholders of the Bankers' Company. The after-

acquired property of the Rapid Company, described in its mortgage, became subject to such mortgage as fast as it was acquired. *Dunham* v. *Railway Co.*, 1 Wall. 254; *Galveston* v. *Cowdrey*, 11 Wall. 459.

The equities of the two appellants are no greater than those of the bondholders of the Bankers' Company. It is well settled that a sale of real estate under judicial proceedings concludes no one who is not a party to those proceedings. Neither the Rapid Company nor the plaintiff was a party to the suit for the foreclosure of the mortgage of the Bankers' Company. Therefore, whatever title either of them had to the property which was attempted to be sold in that foreclosure suit, remained unaffected by the suit. The same fact is true of the attempted sale in the Ohio proceeding, set up in the answer. Neither the Rapid Company nor the plaintiff was a party to that proceeding, and the attempted sale under it did not bar or impair their rights. Moreover, it is quite clear on the proofs that both of the appellants had notice of the title of the Rapid Company and the plaintiff. It is, therefore, unimportant to give special consideration to the Ohio proceeding, or to any claim based by Stokes upon it; and the fact is immaterial whether the sale under that proceeding was set aside, or whether the order setting it aside was subsequently reversed. There was nothing in the Ohio proceeding which could divest or impair the lien of the Rapid Company's mortgage, or the rights of the plaintiff as trustee for the Rapid Company's bondholders.

For these reasons, we are of opinion that the Circuit Court did not err in deciding that the Western lines came under the mortgage of the Rapid Company, and ought to pass under the foreclosure of that mortgage.

We have considered all the points made by the appellants, and are of opinion that there is nothing substantial in them, and we have remarked upon them as fully as seems to be necessary. *Decree affirmed.*

Mr. Justice Field and Mr. Justice Brewer dissented.