HOUSTON OIL CO. OF TEXAS et al. v. W. R. PICKERING LUMBER CO. et al.

(Court of Civil Appeals of Texas. Beaumont. May 15, 1919. Rehearing Denied June 4, 1919.)

1. BOUNDARIES ⚲37(1) — SURVEYS — CONFLICTS—EVIDENCE.

Evidence *held* to support finding that there was no conflict between two surveys.

2. BOUNDARIES ⚲6—CONFLICTING CALLS—COURSES AND DISTANCES.

If surveyor in locating survey was under belief that the northwest corner and west line were 136 varas west from where they were in fact located upon the ground, and located section in question under such mistaken belief, resulting in a conflict in the calls the calls for course and distance from the undisputed, northwest corner and west line should be adopted.

3. CORPORATIONS ⚲672(7)—PERMIT TO DO BUSINESS IN STATE—NECESSITY.

There being no allegation in plaintiff's petition or in defendant's answer and no evidence to the effect that plaintiff, a foreign corporation, is transacting business or has established a general or special office in the state, it was not necessary for plaintiff to prove that it had obtained a permit to do business in the state pursuant to Rev. St. 1895, arts. 745, 746.

Appeal from District Court, San Augustine County; W. T. Davis, Judge.

Trespass to try title by the W. R. Pickering Lumber Company and others against the Houston Oil Company of Texas and others. Judgment for plaintiffs, and defendants appeal. Affirmed.

Kennerly, Williams, Lee & Hill and Andrews, Streetman, Logue & Mobley, all of Houston, and R. E. Minton, of Groveton, for appellants.

Davis & Davis, of Center, and Wm. McDonald, of San Augustine, for appellees.

BROOKE, J. This was a suit in trespass to try title by the W. R. Pickering Lumber Company against the Southern Pine Lumber Company, the Houston Oil Company of Texas, the Kirby Lumber Company, D. C. Kenley, and C. C. Goodwin and wife, Ida Goodwin, J. W. Williams and wife, Florence Williams, William McDonald, and Sallie McDonald.

Plaintiff sued the Houston Oil Company of Texas, Kirby Lumber Company, Southern Pine Lumber Company, and D. C. Kenley for the title to, and possession of, the C. C. Goodwin survey; as to the defendants C. C. Goodwin and wife, Ida Goodwin, J. W. Williams and wife, Florence Williams, and William McDonald and wife, Sallie McDonald, plaintiff pleaded that said parties would be liable on their warranty in the event it failed to recover judgment for the title against the other defendants sued, and asked judgment over on said warranty in that event.

The Houston Oil Company of Texas, Southern Pine Lumber Company, and the Kirby Lumber Company filed general demurrers, general denials, pleas of not guilty, which the defendant Kenley also filed, together with a plea that such actions as may have been taken by him in connection with the subject of litigation were as the agent of the Southern Pine Lumber Company, wherefore he asked to be dismissed, with costs. The defendants, sued on their warranties, filed usual answer in trespass to try title.

The case was tried before the court without a jury, and judgment was rendered in favor of the plaintiffs against all the defendants for the title to, and possession of, the lands in controversy, and against the defendant Southern Pine Lumber Company for the sum of $2,181.21, damages for timber cut, and that plaintiff take nothing as against the defendants sued on their warranty. The judgment shows that the defendants, at the time of the announcement of said judgment, in open court excepted, and gave notice of appeal.

There was no dispute as to the fact that the plaintiff W. R. Pickering Lumber Company held a regular chain of title under the patent by the state, in 1911, to the C. C. Goodwin survey. The defendant Houston

---

⚲For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

Oil Company of Texas held a regular chain of title to G., C. & S. F. section No. 1, and the defendant Southern Pine Lumber Company and the Kirby Lumber Company held contract rights under it.

[1] The question presented was whether the Goodwin survey admittedly to section 1 was in conflict with same. The effect of the judgment entered was that it was not.

We will consider only two matters raised by the appellant on this appeal, as both parties have stated that the only issue to be tried was the issue of whether or not there was a conflict betwen the C. C. Goodwin survey and G., C. & S. F. section No. 1; and, in addition, there was a question raised as to whether or not the plaintiff, who was alleged to be a foreign corporation, and upon which said question there was no proof, should be permitted to bring this suit in Texas. With the exception of the fifteenth assignment of error only, all of the seventeen assignments discussed in appellants' brief are directed to the question of the sufficiency of the evidence to support the finding of the trial judge to the effect that there is no conflict between the two surveys.

The counter propositions to the first seventeen assignments of error, excepting the fifteenth assignment, are as follows:

"The true rule in the settlement of a boundary question is to follow the footsteps of the surveyor; and the findings of the trial court to the effect that the northeast corner of G., C. & S. F. section No. 1 is located 136 vrs. west of Francis Hill's N. W. corner, and that east line of the Green Lane survey as originally surveyed by Roberts in 1855 is 136 varas west of the Francis Hill west boundary line, and the south boundary line of said Green Lane survey as made by Roberts in 1855 is 310 vrs. north of the north line of the A. D. Bateman survey, and the judgment for appellee thereon being supported by abundant, competent, and credible testimony, there is no error in said findings and judgment."

(b) "The evidence, if accepted as true, showing that the surveyor, Whitton, though calling for the northwest corner of the Francis Hill as his beginning corner, was in fact 136 varas west from the point, when he ran south calling for Hill's west line, but in fact running on an old line 136 varas west of Hill's line, and the evidence on this point being sufficient to show that the surveyor acted under a mistaken idea as to the location of said Francis Hill northwest corner and west line, and there being a discrepancy of 136 varas (excess) in the call for distance from the second corner west as called for in the field notes of section 1, to the point actually marked and actually described as marked in his field notes, and a like discrepancy of 136 varas (excess) in the call for distance from the known northwest corner of section 1 east to the place of beginning, there is a conflict in said calls, in resolving which it was clearly the duty of the court to adopt the call for course and distance from the known and undisputed northwest corner of section 1, instead of the disputed call for the place of beginning."

(c) "There being no jury, and the trial judge having found from the evidence adduced that the northwest corner of G., C. & S. F. section No. 1 is located according to the original survey made by Whitton 136 varas west of the Francis Hill N. W. corner, said surveyor supposing that he was beginning at said corner, and calling for the same by mistake, and that the east line of said survey and of the Green Lane survey, as made by Roberts in 1855, are each 136 varas west of the Francis Hill west boundary line, and that the south boundary line of the said Green Lane survey as made by Roberts in 1855 is 310 varas north of the north line of the A. D. Bateman survey, and said findings being supported by abundant and competent and credible testimony, such finding of fact and the judgment of the court based thereon will not be disturbed on appeal."

[2] It is not necessary to discuss every one of appellants' assignments 1 to 17, inclusive, with the exception of the fifteenth assignment; neither do we deem it best to set out the testimony of the various witnesses in detail. Really, the way we view the assignments above mentioned there is no conflict in the testimony, and no dispute as to the true location of the northwest corner of G., C. & S. F. section No. 1, being at a stake in Kellogg's S. B. line, a large pine marked X bears east 5 varas, do. same mark bears 40 west 3 varas. The evidence of the surveyor Whitton, the original surveyor who made the original field notes of the said C., C. & S. F. section 1, if true, showed that in fact said surveyor, in locating such survey, was under the belief that the northwest corner and west line of the Francis Hill were 136 varas west from where they in fact are located on the ground, and located G., C. & S. F. section 1 under this mistaken belief. The evidence on this point is sufficient to support the court's conclusion that the surveyor, acting under this mistaken idea as to the location of the line and corner of the Francis Hill, ran out G., C. & S. F. section No. 1. This created a conflict in the calls, and if, in endeavoring to find the true line, from all the evidence, it was concluded that the call for the northwest corner and west line of the Francis Hill was a mistake, in our opinion it was clearly the duty of the court to adopt the call for course and distance from the undisputed northwest corner and west line of G., C. & S. F. No. 1.

The surveyor McLaurin testified:

"As to whether or not in making the survey I made any test on the ground for the central location of the G., C. & S. F. Railroad Company section 1, I will say I measured the north line of the section. George Rawls assisted me in making the test. The line was blazed out, and we could follow it, and he helped me to measure the line. * * * I said that Mr. Rawls was surveyor for the Houston Oil Co. We had with us then the field notes of the G., C. & S. F. No. 1. Mr. Rawls and I made an actual measurement of that line. The line was somewhat in excess of the length called for in

the field notes of the G., C. & S. F. No. 1. It seems to me like it was 20 varas—right around 20 varas in excess. I cannot be exact right now. I didn't make any examination of the plat that was introduced in the trial of the case Saturday. This plat seems to represent the condition of the ground. I didn't make this plat. The C. C. Goodwin survey, as reflected by that plat, is bordered in red. In making the measurement of the G., C. & S. F. No. 1 we began at the northwest corner to the corner of this strip, the northwest corner of the C. C. Goodwin; it had a·slight excess in it."

There is no dispute or contradiction as to the G., C. & S. F. No. 1 as located on the ground by Whitton having its quota of land, except for the sliding of the Green Lane north 310 varas from the place where he originally thought it was located, which sliding took out of said survey No. 1 a strip of land about 310 varas by 950 varas in size, which he intended to put back in section No. 1 by a resurvey, but which was never done.

To adopt as correct the field notes as written by the surveyor Whitton under the mistaken idea as to the location of the northwest corner and west line of the Francis Hill survey would have the effect of placing in said survey an excess of 136 by 2,370 varas, about 50 acres of land, in addition to the excess shown by the witness McLaurin's testimony to be now contained in said survey. In our judgment the call for the northwest corner of the Hill must absolutely control, without regard to the testimony of the surveyor who ran and established the original lines on the ground, who, following in his testimony his footsteps in making the survey, shows without contradiction that he, in fact, began on an old line 136 varas west of the Francis Hill northwest corner, believing·it to be the Hill corner. We think that the known and undisputed corners will give the G., C. & S. F. No. 1 the course and distance called for in the grant, and will do no injustice, inasmuch as the result will be to give said section No. 1 its full quota of land, except the small conflict between said survey and the Green Lane, which, it would seem, has been the subject of previous litigation.

After a careful examination of the evidence and the authorities and of appellants' able brief, we have reached the conclusion, and which is the just conclusion and the only one which could have been reached, that the findings of the court upon these matters were supported by the evidence, and were based thereon, and said judgment should not be disturbed. Therefore the said assignments from 1 to 17 inclusive, save and except the fifteenth assignment, are all overruled. Oliver v. Mahoney, 61 Tex. 610; Stafford v. King, 30 Tex. 258, 94 Am. Dec. 304; Lafferty v. Stevenson, 135 S. W. 216; Koch v. Poerner, 55 S. W. 386; Polk v. Reinhard, 193 S. W. 687; Boynton Lumber Co. v. Houston Oil Co., 189 S. W. 749; Houston Oil Co. v. Brown, 202 S. W. 107; Jones v. Burgett, 46 Tex. 284; Booth v. Upshur, 26 Tex. 64; Koepsel v. Allen, 68 Tex. 446, 4 S. W. 856; Simms v. Price, Dallam, 618, 619; Edrington v. Kiger, 4 Tex. 93; Oliver v. Chapman, 15 Tex. 409; Swinney v. Booth, 28 Tex. 116; Willis v. Lewis, 28 Tex. 191; Baker v. Clepper, 26 Tex. 633, 84 Am. Dec. 591; Wagner v. George, 56 S. W. 948; Wright v. Campbell, 82 Tex. 389, 18 S. W. 706.

[3] The next assignment which we will consider is the fifteenth, as follows:

"The court erred in rendering judgment in favor of the plaintiffs, against any of the defendants herein, for the reason that the pleading of the plaintiffs alleges that the said plaintiff was a foreign corporation, with a permit to do business in Texas, and there is no proof in the record of the existence of the permit to do business in Texas."

The assignment is submitted as a proposition. The counter proposition is:

"There being no allegation in the plaintiff's petition, or in the defendant's answers, and no proof introduced by either plaintiff or defendants to the effect that plaintiff, a foreign corporation, is transacting business, or has established a general or special office in the state, it was not necessary for the plaintiff to either allege or prove that it had obtained a permit to do business in Texas, as the prohibition applies only to those foreign corporations desiring to transact or solicit business or establish a general or special office in the state."

We are cited by appellant to one authority; that is, Rexall Drug Co. v. Butler Bros., 185 S. W. 989.

In the case of Security Co. v. National Bank, 93 Tex. 575, 57 S. W. 22, the Supreme Court of this state used the following language:

"The next question is, did the Court of Civil Appeals err in holding that the plaintiff in error was disabled to sue in our courts by reason of being a foreign corporation and of having done business in this state without complying with our statutes. The laws in question are found in articles 745 and 746 of our Revised Statutes, and, so much thereof as does not apply to the facts of this case being omitted, they read as follows:

" 'Art. 745. Hereafter any corporation for pecuniary profit, except as hereinafter provided, organized or created under the laws of any other state, * * *. desiring to transact business in this state * * * shall be and the same are hereby required to file with the Secretary of State a duly certified copy of its articles of incorporation, and · thereupon the Secretary of State shall issue to such corporation a permit to transact business in this state. * * *

" 'Art. 746. No such corporation can maintain any suit or action, either legal or equitable, in any of the courts of this state upon any demand, whether arising out of contract or tort, unless at the time such contract was made or tort committed, the corporation had filed its articles of incorporation under the provisions of this chapter. * * *'

"The inquiry which first presents itself to our minds is, has the plaintiff in error done business in this state within the meaning of article 745? The plaintiff in error did not make the original loan. Its first connection with the transaction was the purchase of the bond which had been given by the Wichita Roller Mill Company to the loan and trust company, and the uncontroverted facts show that this transaction was effected in the state of Connecticut by an agent of the latter dealing directly with the plaintiff in error. Very clearly this was not a Texas transaction. The business was done in another state. When, however, the obligation had matured, the plaintiff in error brought suit and obtained a judgment upon it in this state. In the adjustment of its demand it then entered into a negotiation which resulted in the extension of the debt and the execution of the new security out of which the present controversy arose. The purpose of the statute was probably twofold—one to protect the people of the state from irresponsible foreign corporations by affording the means by which they could readily ascertain such information in reference to them as is ordinarily afforded by their charters; the other to place them upon the same footing as like domestic corporations by requiring them to pay a like fee for a permit to do business as is required of a domestic company for filing its charter. See Rev. Stats. art. 2439. It is to be presumed, therefore, that the business had in view, in making the requirement, was the ordinary business of the company—the business it was organized to pursue and which its charter empowered it to pursue. Had it been intended to prohibit a foreign corporation from collecting, extending, adjusting, or bringing suit for a debt contracted elsewhere, it would have been easy 'to have made that intention plain. If it was the purpose of article 745 to deny the corporation the comity which is usually extended throughout the states of the Union of bringing suits in the courts of this state, article 746 was wholly unnecessary. On the other hand, that article shows that such was not the purpose. It in effect merely denies the right of a foreign corporation to bring suit upon any cause of action arising after it had done business in the state without a permit, thus showing that it was regarded that bringing a suit in court was not doing business within the purview of article 745. If bringing suit to collect a debt be not doing business within the meaning of the provision in question, how can the adjustment of a debt be such business? The case of Sullivan v. Sheehan [C. C.] 89 Federal Reporter, 247, was very similar to this both in its facts and as to the law of Minnesota, which was there under construction. In that case the court say: 'The Minnesota statutes referred to by counsel, providing for the conditions upon which foreign building and loan associations may transact business in this state, and prohibiting under penalties the transaction of business by such foreign corporations unless those conditions have been complied with, I think necessarily refers to the ordinary business of such associations. Without complying with those conditions, such foreign corporation would not have the right, by its officers or agents, to come into this state, and there solicit subscriptions for its stock or solicit loans. The same rule applies to any foreign insurance company where similar conditions are required to be complied with before it shall do business in this state, and the business referred to is its ordinary business of insurance. But companies of either of these kinds, if not transacting their ordinary business in' this state, and not privileged to transact their ordinary business in this state, not having complied with the conditions of the Minnesota statutes, would not be prohibited, by any proper interpretation of such statute, from investing in the bonds of the state, or of municipal or other corporations of the state, nor from enforcing such bonds. The prohibition of the statute is only against transacting their ordinary peculiar business in this state so long as the statutory conditions are not complied with. The principal question in the case is whether the Chicago association, in contravention of the statute of Minnesota, did business within this state in obtaining the obligations in suit; whether the notes and mortgages in this case were obtained from citizens of this state, by an officer or agent of that company coming into this state and doing business here; or whether this business was transacted in Chicago by citizens of Minnesota, who went there to transact the business. I apprehend that the penalties which are denounced by statute against these companies in case they do business with residents of this state apply only to cases where such business is done within the state. Such a statute cannot possibly have an extraterritorial effect, so as to prevent a company of that kind, located in Chicago, from transacting business lawfully with a resident of Minnesota who should go to Chicago and transact business there. There is nothing in that statute that would prevent such a resident of Minnesota from going to Chicago, and there applying and subscribing for and acquiring stock of an association of this kind, and there obtaining, if he could, a loan from a corporation of this kind. I think there is nothing in this statute preventing him from there giving security upon property situated in Minnesota to secure such a loan. The prohibition is aimed at' such companies as, by their officers or agents, come into the state of Minnesota—within the territorial limits of the state—to solicit and transact business, and cannot affect business which they perform outside of the state, where they have a right to transact business, merely because such business is transacted with a resident of the state of Minnesota.'"

In Keating Implement & Machine Co. v. Favorite Carriage Co. et al., 12 Tex. Civ. App. 666, 35 S. W. 417, the court said:

"The Favorite Carriage, Company, a private corporation of Ohio, doing business at Cincinnati, recovered judgment against appellant and others in the sum of $3,246, for the conversion of a lot of wheeled vehicles which had been sold on a credit by said carriage company to Culberson, Wright & Co., a firm doing business in Ft. Worth, Tex., and afterwards returned to it in consequence of the insolvency of said firm. Having thus accepted the vehicles and canceled its debt, the carriage company placed them in the hands of Culberson, Wright & Co. for sale on commission. Thereupon appellant caused them to be seized and sold under attachment as the property of said insolvent firm. The sole defense interposed to this action for conversion is founded upon the act of 1889 (page 87), re-

quiring any foreign corporation 'desiring to transact business in this state, or solicit business in this state, or establish a general or special office in this state,' to file with the secretary of state a duly certified copy of its articles of incorporation, and denying the right of any such corporation to maintain an action 'in any of the courts of this state upon any demand, whether arising out of contract or tort, unless at the time such contract was made or tort committed' it had so filed its articles of incorporation.

"Appellant urged the defense by plea in abatement, on demurrer, and in bar. The plea in abatement was stricken out on motion and exceptions because it came too late. This action was proper, if, as the court held, such defense cannot be interposed in bar of the action. The contention of appellant's counsel seems quite plausible that this defense, like that of outlawry or alien enemy, is available in either form. 1 Chit. Pl. 446, 447. But if there was error in restricting it to a plea in abatement—which we need not decide—we are still of opinion that the pleadings would not have warranted a judgment in bar of the action. It was nowhere alleged that the Ohio corporation in question had ever transacted or solicited business or established an office in Texas, or that it had even desired to do so. It was not, then, alleged to be a foreign corporation of the class which the act of 1889 required to file articles of incorporation with the secretary of state. That act was not intended to apply, and does not in terms apply, to foreign corporations not undertaking to do business in this state, and could not be made to apply to such foreign corporations while engaged in interstate commerce. Bateman v. Milling Co., 1 Tex. Civ. App. 90, 20 S. W. 931. The right of a foreign corporation to own property here is an undisputed one, and yet it would be an empty right, indeed, if a trespasser might seize and convert such property to his own use with impunity. Mortgage Co. v. Worsham, 76 Tex. 556, 13 S. W. 384; United Lines Tel. Co. v. Boston Safe-Deposit & Trust Co., 147 U. S. 431, 13 Sup. Ct. 396 [37 L. Ed. 231]. The only consequence of any failure of corporations to which the act applies to comply with its requirements is exclusion from our courts, which is in the nature of a penalty to enforce obedience to the law. As said by the Supreme Court of Arkansas in construing a statute of this class, it 'declares and limits the penalty of noncompliance.' Having done so, the penal consequences cannot be extended beyond the boundaries so defined.' St. Louis, A. & T. Ry. Co. v. Fire Ass'n of Philadelphia [60 Ark. 325], 30 S. W. 350 [28 L. R. A. 83]. Appellant sought to shield itself from the consequences of its own wrong by invoking the penal consequences of this law against the corporation whose property it had tortiously converted to its own use, and should, we think, be held to the same strictness in pleading as is required of one claiming a statutory penalty. A party who thus claims something for nothing should bring himself, both by pleading and proof, within the very terms of the penal statute. Murray v. Railroad Co., 63 Tex. 407 [51 Am. Rep. 650]; Railway Co. v. Cruse, 83 Tex. 460, 18 S. W. 765; Railway Co. v. Loonie, 84 Tex. 259, 19 S. W. 385. The facts stated in the petition did not bring the case within the terms of the act; hence the demurrer was properly overruled, as has been decided by this court. Reed v. Walker, 2 Tex. Civ. App. 92, 21 S. W. 687. Nor did the answer, including the plea in abatement, do it; for it only alleged that the carriage company was a foreign corporation, and that it had not filed its articles of incorporation as required by the act of 1889. The mere fact of its being a foreign corporation, and no other fact, was alleged to show that it was required to conform to the law in question. We doubt, also, if the court's findings of fact—the record containing no statement of facts—justify the conclusion that appellee carriage company was engaged in any other than interstate business. Manufacturing Co. v. Freeman, 113 U. S. 727, 5 Sup. Ct. 739 [28 L. Ed. 1137]. It is clear that it was engaged in that business, and that the single transaction in question was but an incident thereof. It seems to be conceded that it had the right to take the vehicles back in self-protection, but it is insisted that they should have been reshipped to Ohio, and not sold here. Such requirement would seem to be unreasonable."

The Supreme Court denied a writ of error in the case just above quoted.

The only reference to the identity or business of the plaintiff contained in the entire record is contained in the first paragraph of plaintiff's petition, in the following language:

"W. R. Pickering Lumber Company, a private corporation, duly incorporated under the laws of the state of Louisiana, with a permit to do business in the state of Texas, hereinafter styled plaintiff."

There is no proof that said plaintiff is a corporation, or a foreign corporation, or that it is engaged in any sort of business, or has a general or special office within the state, or that the suit grew out of any business in which plaintiff is engaged, and no exceptions are directed to the plaintiff's petition on that score.

See R. J. Allen et al. v. Tyson-Jones Buggy Co., 91 Tex. 22, 40 S. W. 393, 714; Crews & Williams v. Gullett Gin Co., 189 S. W. 793; Implement C. v. Beer, 19 Tex. Civ. App. 311, 45 S. W. 972; Brin v. Shirt Co., 43 S. W. 295; Tel. & Tel. Co. v. Kellogg, 62 Tex. Civ. App. 402, 132 S. W. 963; Erwin v. Powder Co., 156 S. W. 1097; King v. Monitor Drill Co., 42 Tex. Civ. App. 288, 92 S. W. 1047; Geiser Mfg. Co. v. Gray, 59 Tex. Civ. App. 617, 126 S. W. 610; Stein Double Cushion Tire Co. v. Fulton, 159 S. W. 1016; Tyler v. Consolidated Portrait Frame Co., 191 S. W. 710; Miller & Co. v. Goodman, 91 Tex. 41, 40 S. W. 718; Latham & Co. v. Louer Bros., 176 S. W. 920.

We have gone over this record carefully, and, in our judgment, no error was committed by the trial court, and therefore the judgment is in all things affirmed.