## PITTSBURGH, CINCINNATI, CHICAGO AND ST. LOUIS RAILWAY COMPANY *v.* LONG ISLAND LOAN AND TRUST COMPANY.

ERROR TO THE SUPREME COURT OF THE STATE OF OHIO.

No. 16. Argued April 11, 12, 1898. — Decided January 9, 1899.

In view of the statute giving this court authority to reëxamine the final judgment of the highest court of a State, denying a right specially set up or claimed under an authority exercised under the United States, this court has jurisdiction to inquire whether due effect was accorded to the

foreclosure proceedings in the Circuit Courts of the United States, under which the plaintiff in error claims title to the lands and property in question in this suit.

Under the circumstances stated in the finding of facts, Lynde acquired a good title (as between himself and the mortgagor company and the companies which succeeded it by consolidation,) to the thirty-six bonds purchased by him, as well as the right to claim the benefit of the mortgage executed to Parkhurst.

The state court having adjudged that there was no rule of law arising out of the public policy of the State, as manifested by state legislation, that required it to deny to the holders of those bonds the rights and privileges pertaining to commercial paper, purchased in good faith, in the ordinary course of business; and in view of the fact that the lien attending the thirty-six bonds purchased by Lynde did not arise after the institution of the foreclosure suits, but had its origin in the execution and delivery of the Parkhurst mortgage and the authentication by the trustee of the bonds named in it; and in view of the further fact that the trustee in the prior mortgage was not made a party to the foreclosure suits, and was not bound by the decree; under the well settled rule that a sale of real estate under judicial proceedings concludes no one who is not, in some form, a party to such proceedings, this court holds, that the pendency of the foreclosure suits did not interfere with the negotiation or transfer of the bonds secured by the prior Parkhurst mortgage; that the decree in those suits did not impair in any degree the lien created by that mortgage; that the purchase of the bonds by Lynde could not be regarded as hostile to the possession taken of the property embraced by the Roosevelt mortgage for the purpose of selling it in satisfaction of the debts secured thereby; and that the state court did not fail to give due effect to the several decrees in the Circuit Courts in the Roosevelt foreclosure suits, when it held that those decrees did not prevent the defendant in error from claiming the benefit of the lien created by the mortgage to Parkhurst to secure the payment of the bonds purchased by Lynde.

THE case is stated in the opinion.

*Mr. Charles E. Burr* and *Mr. Lawrence Maxwell, Jr.*, for plaintiff in error.

*Mr. E. W. Kittredge* and *Mr. Joseph Wilby* for defendant in error.

MR. JUSTICE HARLAN delivered the opinion of the court.

This writ of error brings up for review a final judgment of the Supreme Court of Ohio affirming a judgment of the Circuit Court of Franklin County, in that State.

The general question presented for determination is whether certain railroad property may be sold in satisfaction of a judgment obtained in 1891 by Charles R. Lynde in the Circuit Court of the United States for the Southern District of Ohio for the amount of 36 coupon bonds, part of 1000 bonds issued by the Columbus and Indianapolis Central Railway Company, an Ohio corporation, in the year 1864.

The bonds were secured by a deed of trust, and were made payable to William D. Thompson or bearer, on the 1st day of November, 1904, each bond reciting, among other things, that it was one of an issue of not exceeding $1,000,000, and had a special lien on all of the railway property, equipments and franchises of the company, as mentioned in the above deed of trust, subject to prior mortgage liens of $3,200,000; that it should " be transferable by delivery, or it may be registered as to its ownership on a registry to be kept by the company, and being so registered, it shall then be transferable only on the books of the company until released from such registry on said books by its owner;" also, that it " shall not become obligatory until it shall have been authenticated by a certificate annexed to it, duly signed by the trustee."

To each bond was attached this certificate: " I hereby certify that this bond is one of the series of bonds described in and secured by the deed of trust or mortgage above mentioned. — A. Parkhurst, *Trustee.*"

The property and rights covered by the above deed of trust, and which were ordered to be sold by the decree in this case if the Columbus, Chicago and Indiana Central Railway Company did not, by a named day, pay the amount found due to the plaintiff, was a line of railroad extending from Columbus, Ohio, to Indianapolis, Indiana, including a branch from Covington to Union, together with the franchises, equipment, property, tolls and interests appertaining thereto.

The case made by the record is set forth in an extended finding of facts covering sixteen pages of the present transcript. Many of the facts so found are not necessary to be here stated. Those which bear more or less upon the present inquiry may be thus summarized:

The Columbus and Indianapolis Central Railway Company prepared, signed and sealed the 1000 bonds referred to, (part of which were the 36 bonds held by Lynde,) and to secure the same executed and delivered the mortgage or deed of trust to Archibald Parkhurst, as trustee.

The above deed recited the consolidation of the Columbus and Indianapolis Railroad Company and the Indiana Central Railway under the name of the Columbus and Indianapolis Central Railway Company, the consolidated company becoming liable for and assuming all the just debts and liabilities of the respective constituent companies; that, for certain purposes, a new series of bonds, 1000 in number, and each for $1000, should be issued, dated November 1, 1864, to be secured by a deed of conveyance covering the mortgagor company's road, its appurtenances, franchises, equipments, property, tolls, income and interest, to a trustee to secure the payment of said bonds and interest warrants. Such a deed was made, and conveyed to A. Parkhurst, trustee, for the "purpose of assuring the punctual payment of the said 1000 bonds and each of them to each and every person who may become the holder of the same or any of them," the mortgagor company's entire railroad from Columbus to Indianapolis, including the branch from Covington to Union, its franchises, etc., in trust to secure the bonds about to be issued by it. The deed contained all the provisions usually found in such instruments.

Parkhurst accepted the trust, and the mortgage or deed of trust was duly recorded in Ohio and Indiana.

Shortly after the signing and sealing of the 1000 bonds they were all duly certified by the trustee in the form above stated.

Prior to January 1, 1867, of the 1000 bonds 790 had been duly issued *in exchange* for a like number and amount of the existing second and third mortgage bonds of the Columbus and Indianapolis Railroad Company as provided in said mortgage, and 31 of said bonds had been duly issued and sold by the railway company. The highest serial number of the 821 bonds so exchanged and sold was No. 833. The remaining 179 of the 1000 bonds, including the 36 bonds described in the petition, having been delivered prior to 1870 by the trustee, Park-

hurst, to Benjamin E. Smith, as president of the company, remained in the latter's possession as president, and the companies into which the same was successively consolidated as hereinafter set forth, until the months of November and December, A.D. 1875, and the happening in those months of the events to be presently stated.

On or about the 11th day of September, 1867, the Columbus and Indianapolis Central Railway Company, which made the above mortgage of 1864, was consolidated with the Union and Logansport Railroad Company and the Toledo, Logansport and Burlington Railroad Company, and became the Columbus and Indiana Central Railway Company; and on or about the 12th day of February, 1868, the latter company and the Chicago and Great Eastern Railroad Company were consolidated and became the Columbus, Chicago and Indiana Central Railway Company, one of the defendants in this action.

No authority or consent was thereafter given by the board of directors of the Columbus, Chicago and Indiana Central Railway Company for the issue or sale of the above 179 bonds or any of them.

The Columbus, Chicago and Indiana Central Railway Company on or about the 20th day of February made and executed its 15,000 bonds of that date, each for the sum of $1000, bearing interest at the rate of seven per cent per annum; and in order to secure their payment executed and delivered its mortgage or deed of trust of that date to James A. Roosevelt and William R. Fosdick, trustees, conveying to them all its property — such conveyance including the property formerly belonging to the Columbus and Indianapolis Central Railway Company that had been previously conveyed to Parkhurst, trustee. That mortgage was recorded in the States of Ohio, Indiana and Illinois immediately after its execution.

Afterwards, and before Roosevelt and Fosdick, trustees, began the foreclosure suit hereinafter mentioned, the Columbus, Chicago and Indiana Central Railway Company issued and sold of the 15,000 bonds so secured, bonds to the amount of $10,428,000 or more.

On or about the 15th day of December, A.D. 1868, the

Columbus, Chicago and Indiana Central Railway Company made and executed its 5000 bonds each for the sum of $1000, of that date and due upon the 1st day of February, A.D. 1909, with interest at seven per cent per annum, and for the purpose of securing their payment executed and delivered its second mortgage or deed of trust to Frederick R. Fowler and Joseph T. Thomas, trustees, conveying to them all its property including the property described in the petition; which mortgage was immediately thereafter duly recorded in Ohio, Indiana and Illinois.

It was set forth in the latter instrument that the mortgagor, in addition to $15,000,000 of first mortgage bonds, was then indebted for outstanding bonds as follows, to wit: Second mortgage bonds of the Columbus and Indianapolis Central Railway Company, $821,000; income bonds of the Columbus and Indiana Central Railway Company, $1,243,000, and Chicago and Great Eastern Railway Company construction and equipment bonds, $400,000; total, $2,464,000; and that it was further indebted in other liabilities in the estimated sum of $2,500,000. It was provided in the Fowler-Thomas mortgage that of the issue of $5,000,000 of bonds, the sum of $2,500,000, being bonds numbered 2501 to 5000 inclusive, should be set aside and used only in exchange for and to satisfy the above $2,464,000 of bonds.

The 821 second mortgage bonds of the Columbus and Indianapolis Central Railway Company referred to in said mortgage were part of the bonds secured by the mortgage to Parkhurst, trustee.

On or about the 22d day of January, 1869, the Columbus, Chicago and Indiana Central Railway Company leased to the Pittsburgh, Cincinnati and St. Louis Railway Company its entire railroad and property, including the railroad and property here in question, for the term of ninety-nine years from the 1st day of February, A.D. 1869, renewable forever. And on or about the 1st day of February, 1869, possession of the leased railroad and property was delivered to the Pittsburgh, Cincinnati and St. Louis Railway Company, which continued to hold possession thereof and to operate the same

as lessee till after the sale to which reference will be presently made.

It was provided in that lease that no bonds beyond the $15,000,000 of first mortgage bonds, secured by the mortgage to Roosevelt and Fosdick, and the $5,000,000 of second mortgage bonds, secured by the mortgage to Fowler and Thomas, and the said $2,000,000 of income bonds, should be issued by the lessor company without the consent of the board of directors of the respective parties to the lease. This lease was duly recorded in the States of Ohio, Indiana and Illinois on or about the 29th day of May, 1873.

On the first and second days of February, 1875, Roosevelt and Fosdick commenced their actions concurrently in the Circuit Courts of the United States for the Southern District of Ohio, the District of Indiana and the Northern District of Illinois for the foreclosure of the mortgage made to them as trustees, and for other purposes, " but," the finding states, " not affecting the Parkhurst mortgage aforesaid or the bonds thereby secured."

In those actions William L. Scott appeared and filed a cross-bill in October, 1881, claiming to be the owner of certain bonds secured by the mortgage to Roosevelt and Fosdick, and praying, among other things, for its foreclosure. But he asked no relief against the Parkhurst mortgage or the bonds secured thereby. Prior to the beginning of the foreclosure suit Thomas resigned his trust under the mortgage made to Fowler and himself, and thereafter that trust was administered by Fowler alone.

In said actions the Columbus, Chicago and Indiana Central Railway Company, Fowler and others were made parties defendant, and were duly served with process or entered their appearance therein.

In the bills of foreclosure the plaintiffs among other things prayed for the appointment of a receiver or receivers of all the railroad, equipment and appurtenances and other mortgaged premises, and of the earnings and income, rents, issues and profits thereof; that the net amount of such earnings should be first applied to the payment of the interest on all the bonds

issued under the mortgage to the plaintiffs, and to the payment of the interest on all mortgage bonds having prior liens on the property, in such order as the court might direct; and that the balance should be applied to the payment of the sums due and in arrears to and for the sinking fund provided for in the mortgage to them for the redemption of the bonds issued under said mortgage.

Such proceedings were had in the foreclosure suits brought in the Circuit Courts of the United States that, on the 2d and 3d days of February, 1875, Roosevelt and Fosdick were duly appointed receivers of the railroad, equipment and appurtenances and other mortgaged premises embraced in and covered by said mortgage, and of the earnings, income, rents, issues and profits thereof; and they were directed not to disturb the possession of the mortgaged premises by the Pittsburgh, Cincinnati and St. Louis Railway Company under the lease to it, but should collect and receive the rental payable by the lessee, and apply the same as provided by the further orders of the court. And in the order of appointment it was further directed that the Columbus, Chicago and Indiana Central Railway Company forthwith transfer and convey to the receivers the said railroad equipment and appurtenances and other mortgaged premises embraced by the mortgage, and including the income, rents, issues and profits thereof. The conveyance so ordered was duly executed and delivered to Roosevelt and Fosdick as receivers, on or about May 25, 1875.

That deed was not recorded, and the plaintiff Charles R. Lynde had no actual knowledge of its existence until the commencement of this action in 1891.

Immediately after their appointment the receivers in pursuance of the above order took possession and control of all said railroad and property, its income, rents, issues and profits, subject, however, to the physical possession and operation of the railroad by the lessee. They continued in possession and control until after the sale of the railroad and the property hereinafter set forth.

Such further proceedings were had in the foreclosure suits that on the 15th, 16th and 23d days of November, 1882, in the

several Circuit Courts, similar decrees were entered, wherein it was adjudged that in case the Columbus, Chicago and Indiana Central Railway Company failed for ten days to pay the sum found due in the decree, the mortgage should be foreclosed and the property conveyed by it — which, as we have seen, *included all the property described in the petition herein* — should be sold for the payment of the principal and interest of said bonds, *subject to the outstanding sectional bonds prior in lien to the mortgage to Roosevelt and Fosdick, and to all other if any paramount liens thereon*, but free from the lien of the mortgage to Roosevelt and Fosdick; that the decree should not in any manner affect, prejudice or preclude *the holders of the paramount liens or any of them*, but should be without prejudice to the rights of them and each of them. It was also adjudged that the purchaser of the mortgaged premises should be invested with, and should hold, possess and enjoy the same and all the rights, privileges and franchises appertaining as fully and completely as the Columbus, Chicago and Indiana Central Railway Company *at the commencement of the suit by Roosevelt and Fosdick held or then held and enjoyed, or was entitled to hold or enjoy, but free from liens then represented by any party to said cause.*

In that decree it was further adjudged that the sale decreed to be made, and the conveyance, after confirmation thereof, to be executed and delivered, should be valid and effectual forever, and that thereby *the defendants in said suits*, respectively, and all persons claiming or to claim under them or any of them, *subsequent to the beginning of the suits by Roosevelt and Fosdick*, as purchasers, incumbrancers or otherwise howsoever, should be forever barred and foreclosed of and from all rights, estate and interest, claim, lien and equity of redemption of, in or to the premises, property, rights and interests so sold and every or any part thereof.

On or about the 10th day of January, 1883, in conformity with the decree, the said property and every part thereof was sold by masters, theretofore appointed to execute the order of sale, William L. Scott, Charles J. Osborn and John S. Kennedy, for the sum of $13,500,000, which sum was insufficient

to pay the outstanding bonds and interest, secured by the mortgage to Roosevelt and Fosdick.

Afterwards, and on or about the 30th day of January, 1883, the Circuit Courts for the Northern District of Illinois and the District of Indiana, and on the 31st day of January, 1883, the Circuit Court for the Southern District of Ohio — the said purchase money having been paid — by orders entered in those causes, duly confirmed and approved the sale, and ordered said premises and property, rights and franchises, to be conveyed to the purchasers, in fee simple, in accordance with the former decrees of those courts. Such a conveyance was made February 21, 1883.

Subsequently, on or about the 17th day of March, 1883, Scott, Osborn and Kennedy, with their respective wives, executed and delivered their deed of that date, conveying said premises and property, rights and franchises, to the Chicago, St. Louis and Pittsburgh Railroad Company, which was authorized to purchase and own the same.

On or about the 10th day of June, 1890, the Chicago, St. Louis and Pittsburgh Railroad Company was duly consolidated with the Pittsburgh, Cincinnati and St. Louis Railway Company, together with other railway companies, under the name of and thereby became the Pittsburgh, Cincinnati, Chicago and St. Louis Railway Company.

The latter company was, at the commencement of this suit, and through its predecessors in title have been ever since the conveyance to Scott Kennedy and Osborn, in the actual, peaceable and undisputed possession of all said railroad, premises and property, rights and franchises, including that described in the petition.

The history of the 36 bonds in suit is as follows:

On and before the 1st day of November, 1864, Benjamin E. Smith was the president of the Columbus and Indianapolis Central Railway Company. He continued to be president of that corporation, and of its successors into which it was successively consolidated, until the sale of the railroad hereinbefore mentioned in 1883.

In the months of November and December, 1875, Smith bor-

rowed for his own purposes $48,000 from W. H. Newbold, Son & Co., brokers in Philadelphia, executing and delivering to them his individual notes. At that time he had, as president of the Columbus, Chicago and Indiana Central Railway Company, the custody and possession of the 179 bonds hereinbefore described; and without the knowledge, authority or consent of that company, but falsely pretending to W. H. Newbold, Son & Co. that he was individually the owner of such bonds, delivered certain of them, including the 36 described in the plaintiff's petition, as collateral security for the payment of his notes. He subsequently renewed his notes with the same collateral from time to time until about the 14th day of January, 1878, when the 36 bonds were sold by W. H. Newbold, Son & Co., and the proceeds applied to the payment of Smith's notes. The balance was paid over to him or for his use, and no part of it was used for the benefit of the railway company.

At the time the bonds were so pledged all the past-due coupons had been cut off, and while they were so held as collateral security the subsequent coupons, as they fell due, were cut from the bonds and delivered to Smith, but were never presented for payment.

At the sale of the bonds, Newbold, Son & Co. themselves became the purchasers of the 36 bonds, paying the full market price, and buying them in good faith without knowledge of any defect in them; and thereafter they sent them to New York for sale.

In the months of May, July and August, 1878, Lynde purchased the 36 bonds in good faith in the usual course of business for valuable consideration, (being about ninety cents on the dollar, which was at the time the usual market price for them,) without knowledge or notice of the unauthorized or fraudulent acts of Smith, and without any knowledge or notice that the bonds had not been sold by the Columbus and Indianapolis Railway Company, and thereby became the *bona fide* holder and owner of the bonds and the coupons thereto belonging. Before the 36 bonds had been purchased by him the railway company had not made default in the payment

of interest on them, and no holder prior to Lynde had elected that the principal sum should become due.

At the time Lynde purchased the bonds the coupons due May 1, 1878, were still attached to the bonds and were unpaid.

On or about the 27th day of August, 1878, Lynde presented the 36 bonds for registration to the secretary of the Union Trust Company, New York, which had been designated by the Columbus, Chicago and Indiana Central Railway Company as registering agent for such bonds in the city of New York — to put the bonds in the name of the party registering them and taking them out of the register and making them to bearer; and the secretary then caused the same to be registered in the name of Lynde. At the time of such registration no inquiry was made by the secretary as to whether or not the bonds had been regularly issued by the Columbus and Indianapolis Central Railway Company.

The coupons maturing May 1, 1878, on these 36 bonds which were attached to them when Lynde purchased, were paid to the latter by the firm of A. Iselin & Co., Wall street, New York, upon presentation by Lynde of the coupons in October, 1878; and the 36 coupons maturing November 1, 1878, were paid to Lynde by the same firm upon the presentation of the coupons in April, 1879. Iselin & Co. were acting for the receivers and a bondholders' committee — that committee furnishing the money for taking up the coupons, and being afterwards reimbursed by the receivers. In October, 1879, Lynde presented the coupons falling due May 1, 1879, on the 36 bonds, but Iselin & Co. then declined to pay them, which was the first knowledge or notice of any kind that he had of any discrimination against or difference between those bonds and any other bonds of the same series. And he has never received payment of any coupon on the 36 bonds or any of them since the payment to him as aforesaid of the coupons maturing in November, 1878. At the time the May and November, 1878, coupons were paid, Iselin & Co. had no knowledge but that the 36 bonds had been regularly issued and sold by the Columbus and Indianapolis Central Railway Company.

From the year 1871 until after the purchase by him of the

36 bonds, Lynde held and owned other bonds secured by the mortgage of the Columbus and Indianapolis Central Railway Company to Parkhurst, trustee, above referred to, being some of the 821 bonds before described.

The Columbus, Chicago and Indiana Central Railway Company made default in the payment of the interest coupons upon said 821 bonds due on the first day of May, 1875, and on the first day of November, 1875, and the interest coupons were not paid until after June 30, 1876, when they were paid by or on behalf of the receivers hereinbefore mentioned, all which facts were known to Lynde at the time he purchased the 36 bonds described in the petition.

At the time of the demand made by Lynde upon Parkhurst, trustee, hereinafter set forth, and at the time of the commencement of this action, interest coupons which had theretofore fallen due upon more than seven hundred of said one thousand bonds described in said mortgage had been paid.

On or about the 27th day of June, A.D. 1891, at Newark, in the State of New Jersey, Lynde made a personal request and demand in writing of Parkhurst as trustee, to commence an action for the foreclosure and sale of the premises in accordance with the provisions of the deed of trust, for and on account of the default made by the Columbus and Indianapolis Central Railway Company in the payment of the coupons upon the 36 bonds; and then and there offered to the trustee sufficient security and indemnity to protect him against all expenses and personal responsibility by him to be made and incurred in the commencement and prosecution of an action for the foreclosure and sale of the premises. Parkhurst as such trustee refused to take the action requested.

The Columbus, Chicago and Indiana Central Railway Company and the Pittsburgh, Cincinnati, Chicago and St. Louis Railway Company have neglected and refused to pay the coupons due upon each of the bonds described in the petition, being coupons from and including coupons maturing May 1, 1879, to and including coupons maturing May 1, 1892, the last two of which fell due since the commencement of this suit.

On the 1st day of October, 1890, the Pittsburgh, Cincinnati, Chicago and St. Louis Railway Company made its mortgage to the Farmers' Loan and Trust Company of New York, and to W. N. Jackson of Indiana, as trustee, for the purpose of securing an issue of bonds to be made by that company to amount in the total to 75,000 bonds at the par value of $1000 each, to be issued as in said mortgage set out, and upon the property described in the answer and cross-petition of the said Farmers' Loan and Trust Company filed in this cause, including the line of railroad and other property connected therewith, described in the petition of the plaintiff herein; that said mortgage was duly recorded as required by law in all of the counties in the several States through or into which that line runs; that by virtue of that mortgage there have been issued bonds to the total number of 5318, being the bonds numbered from 1501 to 6818, both inclusive, and amounting in the total to $5,318,000; and that said bonds are now outstanding and in full force, and no default has been made in the payment of interest thereon.

As conclusions of law from the foregoing facts, the court of common pleas found the equities of the case in favor of Lynde. It held that the 36 bonds and the coupons thereto annexed were the valid and binding obligations of the Columbus and Indianapolis Central Railway Company and of the Columbus, Chicago and Indiana Central Railway Company; that Lynde was the owner and holder of those bonds and coupons, and each of them, as well as the coupons that accrued May 1, 1879, to May 1, 1891, inclusive; that there was due to him on such coupons, down to the entry of the decree, the sum of $47,673.37; and that under and by virtue of the said mortgage or deed of trust described in the petition Lynde had a valid and subsisting lien, to secure said bonds and coupons, upon the railroad property described in the petition as of November 1, 1864, and was entitled to a decree for the payment of the sum so found due. A decree was subsequently entered in conformity to these conclusions. Upon a writ of error to the Circuit Court of Franklin County that judgment was affirmed. The judgment of the latter court was

also affirmed upon writ of error to the Supreme Court of Ohio.

While the cause was pending in the Supreme Court of the State, Lynde died, and the Long Island Loan and Trust Company qualified as his executor.

The first question to be considered relates to the jurisdiction of this court to review the final judgment of the Supreme Court of Ohio.

The contention of the defendant in error is that the record presents no Federal question which this court will review; and that the state court based its decision upon an independent ground, not involving a Federal question, but depending upon principles of general law and broad enough to sustain its judgment. Its further contention is that the Supreme Court of Ohio rightly held that neither Lynde nor the trustee, Parkhurst, were affected by the proceedings in the foreclosure suits instituted in the Circuit Courts of the United States.

Upon looking into the record, we find that the defendant railway company claimed in its answer that if a lien at any time attached to the property in question to secure the 36 bonds purchased by Lynde, such lien was wholly divested and discharged by the above proceedings in the Federal courts under which that company claims title. This, it would seem, was such an assertion of a right and title under an "authority exercised under the United States" as gives this court jurisdiction to reëxamine the final judgment of the state court. Rev. Stat. § 709.

In *Dupasseur* v. *Rochereau,* 21 Wall. 130, 134, 135, — which was a suit to subject certain lands in satisfaction of a debt secured by mortgage, and for the amount of which debt judgment had been obtained, — the defence was rested upon the ground that the defendant purchased the property at a sale made under a judgment of the Circuit Court of the United States for the Eastern District of Louisiana, in a named case, "free of all mortgages and incumbrances and especially from the alleged mortgage of the plaintiff." This defence was not recognized by the Supreme Court of Louisiana, and the case was brought to this court by writ of error. One of the ques-

tions considered was as to the jurisdiction of this court under the act of February 5, 1867, which gives a writ of error to the highest court of a State in which a decision in the suit could be had, "where any title, right, privilege or immunity is claimed under or authority exercised under the United States, and the decision is against the title, right, privilege or immunity specially set up or claimed under  .  .  .  such authority." Rev. Stat. § 709 ; act of February 5, 1867, c. 28, 14 Stat. 385. Mr. Justice Bradley, delivering the opinion of the court, said : " Where a state court refuses to give effect to the judgment of a court of the United States rendered upon the point in dispute, and with jurisdiction of the case and the parties, a question is undoubtedly raised which under the act of 1867 may be brought to this court for revision. The case would be one in which a title or right is claimed under an authority exercised under the United States, and the decision is against the title or right so set up.  It would thus be a case arising under the laws of the United States establishing the Circuit Court and vesting it with jurisdiction ; and hence it would be within the judicial power of the United States, as defined by the Constitution ; and it is clearly within the chart of appellate power given to this court, over cases arising in and decided by the state courts." Having disposed of the question of jurisdiction, the court then inquired whether the state court, in overruling the defence, had given proper validity and effect to the judgment of the Circuit Court of the United States.  Upon this point the court said : " The only effect that can be justly claimed for the judgment in the Circuit Court of the United States is such as would belong to judgments of the state courts rendered under similar circumstances.  Dupasseur & Co. were citizens of France, and brought the suit in the Circuit Court of the United States as such citizens ; and, consequently, that court, deriving its jurisdiction solely from the citizenship of the parties, was in the exercise of jurisdiction to administer the laws of the State, and its proceedings were had in accordance with the forms and course of proceeding in the state courts.  It is apparent, therefore, that no higher sanctity or effect can be claimed for the judgment of the

Circuit Court of the United States rendered in such a case under such circumstances than is due to the judgments of the state courts in a like case and under similar circumstances. If by the laws of the State a judgment like that rendered by the Circuit Court would have had a binding effect as against Rochereau, if it had been rendered in a state court, then it should have the same effect, being rendered by the Circuit Court. If such effect is not conceded to it, but is refused, then due validity and effect are not given to it, and a case is made for the interposition of the power of reversal conferred upon this court. We are bound to inquire, therefore, whether the judgment of the Circuit Court thus brought in question would have had the effect of binding and concluding Rochereau if it had been rendered in a state court. We have examined this question with some care, and have come to the conclusion that it would not."

The same question was again before this court in *Crescent Live Stock Co.* v. *Butchers' Union,* 120 U. S. 141, 146, which was an action for malicious prosecution, the defence being that the existence of probable cause had been previously determined by a judgment in the Circuit Court of the United States. It was contended that the Supreme Court of the State failed to give proper effect to that judgment, and thereby denied to the defendant a right arising under the authority of the United States. The case came here upon writ of error, and the jurisdiction of this court to review the final judgment was sustained. Mr. Justice Matthews, speaking for the court, said: "It must, therefore, be conceded that the sole question to be determined is, did the Supreme Court of Louisiana, in deciding against the plaintiffs in error, give proper effect to the decree of the Circuit Court of the United States, subsequently reversed by this court? It is argued by counsel for the defendant in error that this does not embrace any Federal question; that the effect to be given to a judgment or decree of the Circuit Court of the United States sitting in Louisiana by the courts of that State is to be determined by the law of Louisiana, or by some principle of general law as to which the decision of the state court is final;

and that the ruling in question did not deprive the plaintiffs in error of 'any privilege or immunity specially set up or claimed under the Constitution or laws of the United States.' But this is an error.   The question whether a state court has given due effect to the judgment of a court of the United States is a question arising under the Constitution and laws of the United States, and comes within the jurisdiction of the Federal courts by proper process, although, as was said by this court in *Dupasseur* v. *Rochereau*, 21 Wall. 130, 135, 'no higher sanctity or effect can be claimed for the judgment of the Circuit Court of the United States rendered in a like case, under similar circumstances.'   *Embry* v. *Palmer*, 107 U. S. 3. It may be conceded, then, that the judgments and decrees of the Circuit Court of the United States, sitting in a particular State, in the courts of that State, are to be accorded such effect, and such effect only, as would be accorded in similar circumstances to the judgments and decrees of a state tribunal of equal authority.   But it is within the jurisdiction of. this court to determine, in this case, whether such due effect has been given by the Supreme Court of Louisiana to the decrees of the Circuit Court of the United States here drawn in question.   The decree of the Circuit Court was relied upon in the state court as a complete defence to the action for malicious prosecution, on the ground that it was conclusive proof of probable cause.   The Supreme Court of Louisiana, affirming the judgment of the inferior state court, denied to it, not only the effect claimed, but any effect whatever."

According to these decisions and in view of the statute giving this court authority to reëxamine the final judgment of the highest court of a State denying a right specially set up or claimed under an authority exercised under the United States, it is clear that we have jurisdiction to inquire whether due effect was accorded to the foreclosure proceedings in the Circuit Courts of the United States under which the plaintiff in error claims title to the lands and property in question.

The plaintiff in error contends that the state court did not give due effect to the decrees of the Circuit Courts of the United States in the suits instituted by Roosevelt and Fos-

dick, in that it did not recognize as paramount the rights acquired under those decrees by the purchasers of the property in question, but postponed or subordinated those rights to a lien upon such property which, it is alleged, was created or attempted to be created, while those suits were pending, and while the property was in the actual custody of those courts, by receivers, for purposes of being administered.

Did Lynde, under the circumstances stated in the finding of facts, acquire a good title, as between himself and the mortgagor company, and the companies which succeeded it by consolidation, to the 36 bonds purchased by him from Newbold & Son, as well as the right to claim the benefit of the mortgage executed to Parkhurst? Referring to the facts recited in the finding, the Supreme Court of Ohio said: "Plaintiff in error contends, among other things, that the facts thus stated show that neither the maker of these bonds nor the consolidated companies into which it became merged consented to the sale or delivery of the bonds, and as an owner cannot be deprived of his property without his consent, no title passed. It is true that these bonds were negotiated to Newbold & Son without the knowledge or consent of the company ; but such consent and knowledge is not indispensable to pass the title to negotiable instruments. Where this class of paper, complete in form and transmissible by delivery, is placed by the maker or owner in the custody of one who is thereby clothed with an apparent power of disposition, and the custodian avails himself of the opportunity thus afforded him to negotiate it to an innocent party, the title of the holder is not to be tested by principles applicable to stolen securities, but by principles properly applicable to the transaction as it actually occurred. That the title to negotiable securities may pass by virtue of such a transaction as the finding of fact shows occurred in respect to the negotiation of the bonds in question is, we think, clear upon principle and sustained by authority. *Railway Co.* v. *Sprague,* 103 U. S. 756; *Fearing* v. *Clark,* 16 Gray, 74. Independently of the rules of law designed to protect and give currency to negotiable paper, those principles of natural justice univer-

sally applicable to the affairs of mankind, when applied to this transaction, would seem to demand the protection of the defendant in error as against the maker of the bonds and all who stand in its shoes. He was wholly free from fault in connection with the transaction. Each bond contained a declaration of its transmissibility from hand to hand by mere delivery. He found them for sale, before they were due, in the market, where such securities are usually offered for sale, and bought them at their fair market value without notice of any infirmity in their title. Soon thereafter he took them to the Union Trust Company, in New York city, the agents of the makers, specially appointed to register its bonds, and caused them to be registered in his name on its books. What more could even the highest degree of prudence or diligence demand of him? The maker of the bonds, a railway company, capable of acting through agents only, placed these bonds in the custody of its president, an agent clothed with high, though possibly not clearly defined, powers. The bonds were perfect obligations, bearing on their face a certificate of authentication by the trustee, and containing an express declaration of their transmissibility from hand to hand by mere delivery. He was up to, and long after the time these bonds were negotiated, continued as president of the different consolidated companies as they were successively formed. The companies thus held him out to the world as one who could be trusted to transact matters of importance. Under these circumstances what can be found tending to excite a doubt in the most cautious mind respecting his power to dispose of bonds so entrusted to him? If the maker of these bonds and those who must abide by its title can shift the responsibility and consequent loss resulting from this transaction from themselves to the holder of the bonds, it must be by the application of some stern rule of law founded upon considerations of public policy." 55 Ohio St. 23, 45.

The state court adjudged that there was no rule of law arising out of the public policy of the State, as manifested by state legislation, that required it to deny to the holders of these bonds the rights and privileges pertaining to commer-

cial paper purchased in good faith in the ordinary course of business.

Assuming that this question of general law was correctly determined by that court, we are now to inquire what effect, if any, the proceedings in the foreclosure suits instituted by Roosevelt and Fosdick in the Circuit Courts of the United States had upon the right of Lynde, as the *bona fide* holder of the 36 bonds, to the security furnished by the Parkhurst mortgage?

We have seen that when Lynde purchased the 36 bonds, to secure which, with other bonds, the Parkhurst mortgage had been previously executed, the property described in that mortgage and here in question was in the actual custody of the Circuit Courts of the United States by receivers appointed in the foreclosure suits brought by Roosevelt and Fosdick. The contention of the plaintiff in error is that the property was a fund in those courts to abide the event of the litigation in them, and that, pending the proceedings in those courts and their actual possession of the property, it was impossible that Lynde, by purchasing the 36 bonds, could have acquired any lien thereon which the law would recognize and enforce.

The principal authority cited in support of this contention is *Wiswall* v. *Sampson*, 14 How. 52, 68, in which it was held that while real estate is " in the custody of the court as a fund to abide the result of a suit pending, no sale of the property can take place, either on execution or otherwise, without the leave of the court for that purpose." If the rule were otherwise, the court said, the whole fund might pass from its hands before final decree, and the litigation become fruitless. We do not perceive that the principle announced in *Wiswall* v. *Sampson* controls the determination of the present case. If there had been any attempt by suit to enforce the lien given by the Parkhurst mortgage by an actual sale of the property in question pending the proceedings in the foreclosure suits, it may be that the principle announced in that case could have been invoked, and the sale would have been ineffectual to pass title to the purchaser. But nothing was done by Lynde, after the institution of the foreclosure suits and pending proceedings

therein, which was inconsistent with or tended to defeat the object of those suits. He only purchased the bonds in question, and such purchase was not hostile to the possession by the Circuit Courts in the foreclosure suits of the property mortgaged to secure them, simply because by such purchase he succeeded to an interest in the Parkhurst mortgage. The foreclosure suits proceeded to a final decree without any attempt to interfere with the custody and control of the property for the purposes avowed in those suits; for the bill filed by Roosevelt and Fosdick showed, upon its face, that no relief was asked as against the Parkhurst mortgage, or the bonds secured by it. It was distinctly found, and it is not disputed, that the Roosevelt-Fosdick suits were for the foreclosure of the mortgage in which they were named as trustees, " but not affecting the Parkhurst mortgage aforesaid or the bonds thereby secured." And by the final decree in those suits the mortgaged property was directed to be sold subject to the outstanding bonds prior in lien to the Roosevelt-Fosdick mortgage, and to all other if any paramount liens thereon. The Parkhurst mortgage was prior in date to the Roosevelt-Fosdick mortgage; and the decree in the foreclosure suits expressly declared that nothing contained in it should "in any manner affect, prejudice or preclude the holders of said paramount liens or any of them, but that said decree should be without prejudice to the rights of them and each of them." Thus the decree expressly saved the rights of those who held bonds secured by mortgage prior in date to the mortgage to Roosevelt and Fosdick. It bound only the defendants in the foreclosure suits, and all persons claiming or to claim under them or any of them, subsequent to the institution of those suits. Strictly speaking, the lien that attended the 36 bonds purchased by Lynde did not arise after the institution of the foreclosure suits, although Lynde's purchase was pending the proceedings in those suits, and while the property was in the hands of receivers. That lien had its origin in the execution and delivery of the Parkhurst mortgage and the authentication by the trustee of the bonds named in it, and when any of those bonds became the property of a *bona fide*

holder, the lien given to secure them related back to the date of the mortgage, which was long prior to the institution of the foreclosure suits. Besides, Parkhurst, the trustee in the prior mortgage, was not made a party to the foreclosure suits, and neither he nor those whose interests he was appointed to represent were bound by the decree or any of its provisions. The rule is well settled that a sale of real estate under judicial proceedings concludes no one who is not in some form a party to such proceedings. *United Lines Telegraph Co.* v. *Boston Deposit & Trust Co.*, 147 U. S. 431, 448. It would seem, therefore, clear that the pendency of the foreclosure suits did not interfere with the negotiation or transfer of the bonds secured by the prior Parkhurst mortgage, nor did the decree in those suits impair in any degree the lien created by the Parkhurst mortgage, which antedated the mortgage to Roosevelt and Fosdick. The mere purchase of the 36 bonds by Lynde, and the acquisition by him in consequence of such purchase of an interest in the Parkhurst mortgage, cannot be regarded as hostile to the possession taken by the Circuit Courts of the United States of the property embraced by the Roosevelt-Fosdick mortgage for the purpose of selling it in satisfaction of the debts secured by that mortgage, but subject to prior paramount liens, such as the lien created by the Parkhurst mortgage.

We are of opinion, for the reasons stated, that the state court did not fail to give due effect to the several decrees in the Circuit Courts of the United States in the foreclosure suits instituted by Roosevelt and Fosdick, when it held that those decrees did not prevent the defendant in error from claiming the benefit of the lien created by the mortgage to Parkhurst to secure the payment of the bonds purchased by Lynde from Newbold & Son.

The judgment below is

*Affirmed.*